O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LUIS QUINTANA,<br><br>          Petitioner,<br><br>          v.<br><br>SANDRA ALFARO, Warden,<br><br>          Respondent. | Case No. CV 15-00296-DFM<br><br>OPINION AND ORDER |

**I.**

**BACKGROUND**

**A.   Procedural History**

      In 2012, a jury convicted Luis Quintana ("Petitioner") of voluntary manslaughter and found true the allegation that a principal had a firearm. See 2 Clerk's Transcript ("CT") 245.[1] The trial court also found true that Petitioner's prior conviction was both a serious felony and a strike. See 12 RT 7206. The trial court sentenced Petitioner to 18 years in state prison. See 2 CT

---

     [1] With the exception of the Clerk's and Reporter's Transcripts, citations to the filed documents are to the CM/ECF pagination.

306.

Petitioner appealed, raising claims of instructional error and error in permitting an amendment to the information after the jury verdict. <u>See</u> Lodged Document ("LD") 13. Petitioner also argued that the judgment contained various clerical errors. <u>See id.</u> The California Court of Appeal directed the trial court to correct the clerical errors but otherwise affirmed the judgment. <u>See</u> LD 1. Petitioner filed a petition for review. <u>See</u> LD 2. On April 9, 2014, the California Supreme Court summarily denied review. <u>See</u> LD 3.

On January 14, 2015, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody in this Court, raising the same claims that were raised on direct appeal as well as ten new, unexhausted claims. <u>See</u> Dkt. 1 ("Petition"). Petitioner moved to stay proceedings in this Court to exhaust his new claims, <u>see</u> Dkt. 4, which this Court granted, <u>see</u> Dkt. 12. Petitioner then withdrew his unexhausted claims. <u>See</u> Dkt. 13.

On January 27, 2015, Petitioner filed a habeas corpus petition in the Los Angeles County Superior Court raising the ten unexhausted claims. <u>See</u> LD 4. The Superior Court issued a reasoned decision denying the petition on July 29, 2015. <u>See</u> LD 5. Petitioner then filed a habeas corpus petition raising the same claims in the California Court of Appeal on August 26, 2015, <u>see</u> LD 6, which was summarily denied on December 2, 2015, <u>see</u> LD 7. Finally, Petitioner filed a habeas petition raising the same claims in the California Supreme Court on December 2, 2015, <u>see</u> LD 8, which was summarily denied on May 11, 2016, <u>see</u> LD 9.

On June 23, 2016, Petitioner moved to amend his petition to add back in his newly exhausted claims. <u>See</u> Dkt. 24. This Court granted Petitioner's motion and ordered the First Amended Petition ("FAP") filed. <u>See</u> Dkt. 32. Respondent filed an answer to the FAP. <u>See</u> Dkt. 41 ("Answer"). Petitioner filed a traverse. <u>See</u> Dkt. 46 ("Traverse"). Both parties have consented to

2

proceed before a United States Magistrate Judge. See Dkts. 2, 10, 11.

**B.**   **Summary of the Evidence Presented at Trial**

The underlying facts are taken from the unpublished opinion of the California Court of Appeal. Unless rebutted by clear and convincing evidence, these facts are presumed correct. Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1). Because Petitioner has raised a claim of insufficient evidence, the Court has independently reviewed the record. See Jones v. Wood, 114 F.3d 1002, 1008.

### 1. Prosecution Case

Silvia Lilly Melara lived with her husband, victim Julio Cesar Olivares, in Los Angeles.[] The first time Melara saw [Petitioner] was in May 2009 when Melara and Olivares were in their truck by a fish market on the corner of 85th Street and Central Avenue. As they were about to make a left turn, Melara saw [Petitioner] walking toward their truck. He looked at Olivares in an angry way, like a "mad dog." [Petitioner] and Olivares began to argue and [Petitioner] told him, "I'll light you up, motherfucker." Melara yelled at Olivares not to fight, and they drove off.

Around 5:30 p.m. on July 9, 2009, the day of the shooting, Melara heard yelling outside her home. She looked out and saw [Petitioner], codefendant Jose, and an unidentified African-American man standing on the sidewalk by her yard. The men shouted Oliveras's name. Jose asked Melara where was the "guy that drives a white truck?" Melara said the truck belonged to her and Olivares was not home. [Petitioner] said, "Tell him to come out. Tell him to come outside." [Petitioner] and Jose appeared angry and [Petitioner] said Olivares had crashed into their car.

3

Melara told them again Olivares was not home, so the men told her they would be back in 15 minutes and drove off in a black truck. Oliveras arrived home five minutes later. Melara told him the men were looking for him and they would return in 15 minutes. Melara then left.

Eduardo Canela was Olivares's next-door neighbor, and on the day of the shooting, he was working on his truck in his front yard. He saw a black Tahoe or Yukon vehicle pass by three times, recognizing [Petitioner] as the driver. At one point [Petitioner] stopped while looking at Canela's house and asked Canela if the person with the white truck lived there, meaning Olivares. [Petitioner] appeared upset. Canela told [Petitioner] no, he lived there with his wife and children. [Petitioner] left and stopped to talk with individuals in a Camaro "[s]ome feet ahead" of Canela's house.

About 30 minutes later, a brown Suburban vehicle arrived at Canela's house and parked in his driveway. [Petitioner], Jose, and an unidentified African-American man exited the vehicle. [Petitioner] and Jose approached Canela's house and knocked on the door several times. Canela was sitting in his truck at the time and gestured to them as if to say, "what are you looking for?" Appearing angry and upset, they came toward Canela. In Spanish, [Petitioner] warned him not to cover up for "him," that is, Olivares. Jose warned Canela if he did, his house would be burned down along with anyone else inside. They tried to open the doors to Canela's truck, and Canela became afraid and drove away "rapidly." He drove a few blocks, parked, and called Olivares, asking who were the men looking for him. After about 10 or 15

4

minutes, Canela returned home, went inside, and locked his doors.

A few minutes later, Canela heard arguing coming from Olivares's house. When he looked out his front door, he saw [Petitioner], Jose, and two other people standing by the closed gate outside Olivares's house near the same Suburban from earlier. Two other people were in the car. Olivares stood a few feet away from [Petitioner] and Jose, separated by the gate. Although Canela did not understand English well, he heard Jose yell in English, "Leave my brother alone" and "I'm from Watts. This is my hood." After a few seconds, Canela quickly walked out his back door and over to Olivares's house to get a better view of what was happening. When he entered Olivares's back door to the kitchen, he heard several gunshots and crouched down. When the firing stopped, he went to the front door and found Olivares lying in the threshold, bleeding from gunshot wounds. Canela pulled him into the house.

At the same time, Olivares's cousin Toribio Olivares (Toribio) pulled up to Olivares's house. He heard two or three gunshots, so he ducked down and stopped his car. When Toribio raised his head, he saw the brown Suburban parked in front of Olivares's house. He saw [Petitioner] and Jose on the sidewalk facing the house. He also saw the door of the Suburban was open halfway and a passenger, Delgado, fire four or five shots out of the window toward the front door of Olivares's house. He saw another person in the driver's seat, but he could not see the person clearly. After the shooting, [Petitioner] and Jose ran from the scene in different directions and the Suburban drove away. Toribio ran into Olivares's house and helped Canela pull Olivares inside. Canela

5

had called 911 by that time and handed Toribio the phone so he could speak to the operator in English.

Two Los Angeles police officers investigated the scene of the shooting. Because Olivares was expected to live at the time, the scene was investigated as an assault with a deadly weapon. Officers searched the surrounding residences for witnesses. They also interviewed Melara, Canela, and Toribio at the scene. A search uncovered two spent nine-millimeter shell casings on the sidewalk outside the gate to Oliveras's house, one spent nine-millimeter shell casing at the gate, and a bullet fragment on Olivares's front porch. A police department criminalist concluded the casings came from two different firearms. No weapons or spent shell casings were found in the house or on the front porch.

Los Angeles Police Officer Gorgonio Medina interviewed witnesses as part of the ongoing investigation. Based on information gleaned from those interviews, he prepared a photographic six-pack lineup and showed it to the eyewitnesses, all of whom identified [Petitioner] and Jose. Officer Medina also located the black Yukon that had driven by Canela's house several times, which was registered to [Petitioner]. Officer Medina eventually arrested [Petitioner] and Jose and recovered keys from Jose belonging to a GMC vehicle, which turned out to be the Suburban from the incident. When Officer Medina asked Jose what the keys were for, Jose responded, "What the fuck? That's the car that you've been looking for, my truck. Let's get it over with." Officers located and impounded the Suburban. When they analyzed it, they located two bullet dents or impacts, but it was impossible to tell whether they happened during the incident or at

some other time. There was also no way to determine whether the shots came from the direction of Olivares's house, although that could not be excluded as a possibility.

In January 2010, Olivares died from complications from his gunshot wounds. Prior to his death, he gave a conditional interview at the hospital, which was recorded and played for the jury.

**2. Defense Case**

None of the codefendants testified.

College student Veronica Cortes lived across the street and three houses down from Olivares. Around dinner time the day of the shooting, Cortes was sitting in her living room when she heard gunshots. She ran to her bedroom and looked out the window. She saw someone come from the right side of the Suburban, which was parked in the middle of the street, and run to the back of the vehicle and grab the luggage rack as the Suburban pulled away. She initially testified she did not see shots fired from the direction of the Suburban. However, on cross-examination she admitted she had seen the front passenger shoot at the house, and then she claimed not to remember one way or the other. She also stated the passenger was holding a black nine-millimeter firearm.

She also testified she saw an individual on the porch of Olivares's house shoot toward the Suburban and run into the house, and that she had told Officer Medina during an interview there was a man on the porch wearing a white shirt shooting at the Suburban. She testified on cross-examination, however, she did not actually see anyone; she merely heard gunshots from that direction.

She saw four or five men leave the left side of the house and run away. She did not see anyone on the sidewalk. She saw one person exit the gate in front of Olivares's house and run northbound on Wadsworth Avenue. The person was not carrying any objects in his hands.

Cortes never contacted law enforcement about what she had seen. The defense learned she had witnessed the shooting because she had told her brother-in-law, who was friends with [Petitioner]. She recalled [Petitioner] had been over to her house two times in the past, but did not recall seeing him the day of the shooting.

On July 13, 2009, Detective Teresa Hernandez was working phone duty at the 77th Police Division when a woman called identifying herself as Oliveras's wife. She stated two male Hispanics had come to her house looking for Olivares, one of whom she had seen previously on the corner of Central Avenue and 85th Street. The woman did not tell her the man told her husband, "I'm going to light you up, motherfucker."

LD 1 at 3-7 (citations omitted).

## II.

## PETITIONER'S CLAIMS

1.    The trial court failed to instruct the jury that an aider and abettor could be guilty of a lesser crime than the perpetrator. See FAP at 5, Petition at 19-35 ("Ground One").[2]

---

[2] The FAP refers to an "attached memorandum of points and authorities," but no memorandum is attached. This Court presumes that Petitioner intended to refer to the Memorandum of Points and Authorities attached to the Petition.

2.      The trial court failed to instruct the jury sua sponte that involuntary manslaughter is a lesser included offense of murder. <u>See</u> FAP at 5-6, Petition at 36-42 ("Ground Two").

3.      The trial court allowed the prosecution to amend the information after the jury reached its verdict. <u>See</u> FAP at 6, Petition at 43-50 ("Ground Three").

4.      Allowing the prosecution to amend the information after the jury verdict violated Petitioner's rights under <u>Boykin v. Alabama</u>, 295 U.S. 238 (1969), and <u>In re Tahl</u>, 1 Cal. 3d 122 (1969). <u>See</u> FAP at 6, Petition at 51-52 ("Ground Four").

5.      The trial court erred by instructing the jury on an alternative theory of an uncharged conspiracy to commit simple assault. <u>See</u> FAP at 6-7, Petition at 53-56 ("Ground Five").

6.      Insufficient evidence supported Petitioner's conviction for voluntary manslaughter as a natural and probable consequence of conspiracy to commit simple assault. <u>See</u> FAP at 8, Petition at 56-63 ("Ground Six").

7.      The trial court failed to instruct the jury sua sponte that it could return a verdict of conspiracy to commit simple assault. <u>See</u> FAP at 8, Petition at 63-66 ("Ground Seven").

8.      The trial court failed to instruct the jury with CALCRIM No. 620 on causation. <u>See</u> FAP at 8, Petition at 66-68 ("Ground Eight").

9.      The trial court failed to instruct the jury that an aider and abettor must have the specific intent to aid and abet the principal's crime. <u>See</u> FAP at 8-9, Petition at 68-70 ("Ground Nine").

10.     The prosecutor misstated the law on aider and abettor liability during the closing argument. <u>See</u> FAP at 9, Petition at 70-72 ("Ground Ten").

11.     Petitioner's trial counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's misstatement of law. <u>See</u> FAP at 9,

9

Petition at 72-76 ("Ground Eleven").

12.     Petitioner's appellate counsel rendered ineffective assistance by failing to raise Grounds Four through Eleven on appeal. <u>See</u> FAP at 9-10, Petition at 77-78 ("Ground Twelve").

13.     The cumulative impact of the constitutional violations listed above violated Petitioner's right to a fair trial, an adequate appeal, and effective assistance of counsel. <u>See</u> FAP at 10, Petition at 78-79 ("Ground Thirteen").

### III.

### STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts may grant habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court proceedings" only if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Overall, AEDPA presents "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." <u>Burt v. Titlow</u>, 571 U.S. 12, 19 (2013). AEDPA presents a "'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011) (internal citations omitted). The prisoner bears the burden to show that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in

10

existing law beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011). In other words, a state-court "determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness" of that ruling. <u>Id.</u> at 101 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). Federal habeas corpus review therefore serves as a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Id.</u> at 102-03 (citation omitted).

Here, on direct appeal, the California Court of Appeal rejected Grounds One through Three on the merits. <u>See</u> LD 1.[3] The California Supreme Court then summarily denied review. <u>See</u> LD 3. Thus, for purposes of applying the AEDPA standard of review, the California Court of Appeal decision on direct appeal constitutes the relevant state court adjudication on the merits for Grounds One through Three. <u>See</u> <u>Wilson v. Sellers</u>, --- U.S. ---, 138 S. Ct. 1088, 1192 (2018) (holding that federal habeas court "look[s] through" summary denial of claim to last reasoned decision from state courts to address claim and "presume[s] that the unexplained decision adopted the same reasoning").

The Superior Court rejected Grounds Four through Thirteen on the

---

[3] Although the California Court of Appeal concluded that it need not decide the claim of instructional error in Ground Two because any error was harmless, <u>see</u> LD 1 at 16, its resolution of Ground Two was nonetheless an adjudication of that claim on the merits to which AEDPA's deferential standard of review applies. <u>See</u> <u>Davis v. Ayala</u>, 135 S. Ct. 2187, 2198 (2015) ("There is no dispute that the California Supreme Court held that any federal error was harmless beyond a reasonable doubt under Chapman, and this decision undoubtedly constitutes an adjudication of Ayala's constitutional claim 'on the merits.'").

merits in a reasoned decision. <u>See</u> LD 5.[4] The California Court of Appeal and California Supreme Court then summarily denied habeas petitions raising these claims. <u>See</u> LD 7, 9. For purposes of applying the AEDPA standard of review, the Superior Court decision constitutes the relevant state court adjudication on the merits for Grounds Four through Thirteen.

**IV.**

**DISCUSSION**

**A.    Instructional Error**

    **1.    Applicable Law**

The issue of whether a jury instruction violates state law generally is not a federal question or a proper subject for habeas corpus relief. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991). To show a violation of due process, the petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction was fundamentally unfair. <u>See</u> <u>id.</u> at 72.  The challenged jury instructions "must be considered in the context of the instructions as a whole and the trial record." <u>Id.</u>

A jury instruction violates due process if it fails to give effect to the requirement that the prosecution must prove every element of the offense. <u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004). "Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." <u>Id.</u> "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." <u>Henderson v.</u>

---

[4] The Superior Court used the same reasoning to reject Ground Seven that the California Court of Appeal used to reject Ground Two. For the reasons set forth in n.2, <u>supra</u>, AEDPA's deferential standard of review applies to the Superior Court's determination.

<u>Kibbe</u>, 431 U.S. 145, 154 (1977). Even if the instruction violated the petitioner's right to due process, the petitioner can only obtain relief if the unconstitutional instruction had a "substantial and injurious effect or influence" on the jury's verdict and thereby resulted in actual prejudice. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38 (1993); <u>accord</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 116-17 (2007). Such a showing is not made where the evidence of guilt is, "if not overwhelming, certainly weighty," and "other circumstantial evidence . . . also point[s] to Petitioner's guilt." <u>Brecht</u>, 507 U.S. at 639.

### 2. Failure to Properly Instruct on Aider and Abettor Liability

Petitioner contends in Grounds One and Nine that the trial court failed to instruct the jury that an aider and abettor may be found guilty of a lesser crime than the principal and must have the specific intent to aid and abet the principal's crime. <u>See</u> FAP at 5, 8-9.

### a. Factual Background

At Plaintiff's trial, the jury was instructed with the 2010 version of CALCRIM No. 400, which states:

> A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.
>
> A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.
>
> Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime.

2 CT 206. The jury also received CALCRIM No. 401, which states:

> To prove that the defendant is guilty of a crime based on

13

aiding and abetting that crime, the People must prove that:

> 1. The perpetrator committed the crime;
>
> 2. The defendant knew that the perpetrator intended to the crime;
>
> 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND
>
> 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

If all these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.

The People have the burden of proving beyond a reasonable doubt that the defendant aided and abetted. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory.

2 CT 207-08.

The California Court of Appeal rejected Petitioner's claim on direct

14

appeal that the trial court should have amended CALCRIM No. 400 to inform jurors that an aider and abettor could be guilty of a lesser crime than the perpetrator. See LD 1 at 9. In so holding, the state appellate court noted that defense counsel failed to object at trial, and that the instruction was correct under California law. See id. Notably, the instruction the jury received did not use the phrase "equally guilty," terminology that California courts have found misleading. See id. at 10-11 (citing People v. Samaniego, 172 Cal. App. 4th 1148, 1164-65 (2009)). Thus, the California Court of Appeal found no instructional error. See id. ("Nothing in these instructions created a reasonable likelihood the jury believe appellant had to be 'equally' guilty as the perpetrator as an aider and abettor.").

Likewise, when rejecting Petitioner's state habeas petition, the Superior Court rejected Petitioner's claim that the trial court did not comply with California law requiring that an aider and abettor act with the specific intent to aid and abet the principal's crime. See LD 5 at 8. The Superior Court found that Petitioner failed to show "any reasonable likelihood that this jury understood that Petitioner could be convicted of murder, or voluntary manslaughter, or engage in activities where a principal was armed with a firearm, even though he had no intent to kill the Victim," and noted that "[n]othing demonstrates that this jury understood that Petitioner could be convicted without consideration of his intent." LD 5 at 8.

b.    Analysis

To the extent that Petitioner raises state-law instructional error claims, they fail. See Estelle, 502 U.S. at 71-27. As for Petitioner's constitutional claims about the aider and abettor instructions, the state courts reasonably rejected Petitioner's arguments. The jury was instructed that an aider and abettor must "specifically intend[]" to aid "the perpetrator's commission of that crime." 2 CT 207. These instructions required the jury to consider

15

Petitioner's mental state when determining whether he was guilty as an aider and abettor. 2 CT 207-08. As the Superior Court noted, the jury could not have found Petitioner guilty without also finding that he had the requisite specific intent to aid the principal's crimes. See LD 5 at 8.

Moreover, the jury was instructed correctly under California law that an aider and abettor "is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." 2 CT 206. The jury is presumed to have followed its valid instructions. See Weeks v. Angelone, 528 U.S. 225, 234 (2000). Thus, this Court cannot assume that the jury misinterpreted the valid instruction to mean that an aider and perpetrator must be found equally guilty without any information supporting the claim. Petitioner has shown no violation of federal law regarding aider and abettor liability instruction claims.

Moreover, even if the trial court erred when instructing the jury, any alleged error did not have a substantial and injurious effect or influence in determining the jury's verdict. See Brecht, 507 U.S. at 637-38. The jury heard overwhelming evidence implicating Petitioner in the conspiracy to commit assault on Olivares, and evidence suggesting that a reasonable person in Petitioner's position would have known that his co-conspirators would shoot Olivares during the confrontation. See LD 1 at 14.

As the state appellate court concluded, the evidence showed that Petitioner "deliberate[ly] escalat[ed] . . . the conflict between [Petitioner] and his conspirators with Olivares, culminating in the armed confrontation in front of his house during which Olivares was fatally shot." LD 1 at 16. Specifically, the jury heard testimony from Melara that several months before the shooting, Petitioner threatened Olivares, shouting, "I'll light you up motherfucker." 3 RT 1273-74. On the day of the shooting, Petitioner passed by Olivares's house three times. The first time, Petitioner and Jose confronted Melara, asking for

16

Oliveras. 3 RT 1277. Melara testified that Petitioner and Quintana appeared angry and testified that Oliveras had crashed into their car. Id. During Petitioner's next two visits, Petitioner and his coconspirators angrily confronted Canela, seeking Olivares's location. 3 RT 1597. Canela testified that Jose warned Canela not to "to cover up for [Olivares]" or else "[Canela's] house would [ ] be burned down with whoever was in there." 3 RT 1595. When Petitioner returned with Jose and two other men to Olivares's house, two of the men fired multiple shots at Olivares as he stood on his front porch, striking him multiple times. See 4 RT 1823-24; 5 RT 2775-79. The coroner testified that the gunshot wounds led to Olivares's death six months later. See 7 RT 3426-28. Because overwhelming evidence supported Petitioner's conviction, any alleged error in the aider and abettor instructions did not have a substantial and injurious influence on the outcome of Petitioner's trial.

### 3. Failure to Instruct on Involuntary Manslaughter

Petitioner argues in Ground Two that the trial court failed to sua sponte instruct the jury on involuntary manslaughter as a lesser included offense of murder. See FAP at 5-6, Petition at 36-42.

#### a. Teague

Respondent argues that to the extent that Petitioner contends that a trial court has a sua sponte duty to instruct the jury on lesser-included offenses in a non-capital case, such a claim is precluded by Teague v. Lane, 489 U.S. 288 (1989). See Answer at 28-32. Where a respondent properly raises a Teague argument, the Court must address it before reaching the merits of a claim. See Caspari v. Bohlen, 510 U.S. 383, 389 (1994).

In Teague, the Supreme Court held that, in general, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S. at 310. There are two exceptions: (1) if the new rule would place "certain kinds of primary,

17

private individual conduct beyond the power of the criminal law-making authority to proscribe"; or (2) if it is a "watershed rule[] of criminal procedure." Id. at 311. A case announces a new rule "if the result was not dictated by precedent existing at the time the defendant's conviction became final." Id. at 301. Further, in deciding whether a constitutional rule is "new" for Teague purposes, the Court is not limited to surveying Supreme Court precedent, but may also consider Ninth Circuit precedent. See Butler v. Curry, 528 F.3d 624, 635 n.10 (9th Cir. 2008); Leavitt v. Arave, 383 F.3d 809, 819 (9th Cir. 2004) (per curiam).

No clearly established Supreme Court authority provides that a criminal defendant in a non-capital case is entitled to instructions on a lesser-included offense. See Hopkins v. Reeves, 524 U.S. 88, 96-98 (1998) (leaving matter of lesser-included offense instructions up to states). Nor does Ninth Circuit precedent provide support for such a rule. See Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("Under the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."). Thus, Petitioner's claim that the trial court had a duty to instruct on lesser included offenses is Teague-barred. See Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995) (noting that Ninth Circuit "has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case," and that to hold otherwise would create new rule in violation of Teague), overruled on other grounds, Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).

b.    Merits

On the merits, Petitioner's contention that involuntary manslaughter is a lesser included offense of the murder offenses charged in his case is also contrary to California law. Under California law, a trial court must only instruct a jury on lesser included offenses where substantial evidence supports

finding that the offense committed may have been less than the offense charged. See People v. Cunningham, 25 Cal. 4th 926, 1008 (2001). Petitioner claims that involuntary manslaughter is a lesser included offense of voluntary manslaughter and murder. A killing during the commission of a misdemeanor that is dangerous to human life may constitute involuntary manslaughter in some circumstances. See People v. Cox, 23 Cal. 4th 665, 675 (2000). However, the underlying crime in Petitioner's case was assault with a deadly weapon—a felony rather than a misdemeanor. See People v. Garcia, 162 Cal. App. 4th 18, 28 n.4 (2008), disapproved on other grounds in People v. Bryant, 56 Cal. 4th 959 (2013) (noting that assault with deadly weapon is inherently dangerous felony). Because the killing occurred during the commission of an inherently dangerous felony, it could not have constituted involuntary manslaughter under California law.

Moreover, this claim also fails because any instructional error did not have a substantial and injurious effect on the jury's decision. As detailed above, the jury heard overwhelming evidence that Petitioner deliberately escalated the conflict between Petitioner and the victim, an escalation that ultimately resulted in the shooting. As the state appellate court reasonably concluded, it was "not reasonably probable the jury would have convicted Petitioner of involuntary manslaughter if the trial court had given that instruction, so any error in failing to do so was harmless." LD 1 at 17. The state courts reasonably rejected Petitioner's claim that his constitutional rights were violated by the trial court's omission of a lesser included offense on involuntary manslaughter.

### 4. Conspiracy to Commit Simple Assault Instruction

Petitioner contends in Ground Five that the trial court erred by instructing the jury on uncharged conspiracy to commit simple assault as the target offense of a natural and probable consequences without evidence of the

crime at the preliminary hearing. See FAP at 6-7, Petition at 53-56. Petitioner contends in Ground Seven that the trial court failed to sua sponte instruct the jury that it could convict Petitioner of conspiracy to commit simple assault as a target crime—rather than solely considering it as an element of murder or manslaughter as a natural and probable consequence of conspiracy to commit a simple assault. See FAP at 8, Petition at 63-66. He argues that the lack of a separate instruction wrongly implied that if the jury did not convict Petitioner of murder or voluntary manslaughter, then it must find him not guilty of all charges. See Petition at 64.

        a.    Factual Background

The trial court gave CALCRIM No. 416 (evidence of uncharged conspiracy) and CALCRIM No. 417 (liability for coconspirators' acts). CALCRIM No. 416 instructed the jury that to find Petitioner liable for a conspiracy to commit assault, it must find that Petitioner intended to agree and did agree with another member of the conspiracy to assault Olivares, intended for a member of the conspiracy to assault Olivares, and undertook at least one of the following overt acts in furtherance of the conspiracy: driving around the block looking for Olivares, approaching and threatening Canela when asking about Olivares, approaching Olivares's home to look for him, arming himself, entering the car, driving to Olivares's house, exiting the vehicle, and confronting Olivares. See 2 CT 209-11. CALCRIM No. 417 instructed the jury that "[a] member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy," defining a natural and probable consequence as "one that a reasonable person would know is likely to happen if nothing unusual intervenes." 2 CT 214.

Petitioner's counsel objected to these instructions, arguing that there was

20

no evidence of an agreement by any people in the case such that the instructions were inappropriate. See 10 RT 4805. However, the trial court permitted them because circumstantial evidence supported instructions for conspiracy to commit a simple assault. See 10 RT 4806-07.

On habeas review, the Superior Court rejected Petitioner's claim that he was denied due process and a fair trial when the trial court instructed the jury on an uncharged conspiracy to commit simple assault. See LD 5 at 5. The Superior Court determined that the trial court did not err when it instructed the jury on uncharged conspiracy, simple assault, and liability for a conspirator's acts. It noted that on direct appeal, the California Court of Appeal held that evidence "overwhelmingly satisfied" the theory that if the jury found conspiracy to assault the victim, it could convict Petitioner of murder or manslaughter as a natural and probable consequence of that assault. LD 5 at 5.

b.    Analysis

The Superior Court reasonably concluded that the evidence presented at trial supported an instruction on conspiracy to commit simple assault of Olivares. At trial, the jury heard evidence that Petitioner yelled at Olivares several months earlier stating, "I'll light you up motherfucker." 3 RT 1272-74. It also heard evidence that Petitioner and his coconspirators passed by Olivares's house three times on the day of the shooting, threatened to burn down Canela's house unless he shared information about Olivares, and fired multiple shots at Olivares.  See 3 RT 1281-83, 1593-95; 5 RT 2775-79, 2837-40. This evidence supported a finding that Petitioner intended to conspire with the other people in the car who intended to shoot Olivares, drove to look for Olivares, and threatened Canela for information. Moreover, a reasonable person would know that shooting Olivares would result—at a minimum—in assault and—at a maximum—in death. Thus, the jury was justified in convicting Petitioner of voluntary manslaughter as a natural and probable

21

consequence of a conspiracy to commit simple assault, and the trial court was justified in instructing the jury on an uncharged conspiracy to commit simple assault to explain the natural and probable consequences instruction.

Even if the trial court erred in instructing the jury on conspiracy to commit simple assault, the ailing instructions did not so infect the trial such that the resulting conviction was fundamentally unfair—especially when considered within the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72. Finally, as discussed in Section IV.A.2.b., any error did not have a substantial and injurious effect or influence on the jury's verdict such that habeas relief is unwarranted. See Brecht, 507 U.S. at 637.

As for Petitioner's argument that the trial court failed to sua sponte instruct the jury that it could return a verdict of conspiracy to commit simple assault separate from the natural and probable consequences theory instruction, it also fails. Conspiracy to commit simple assault was the target offense under the natural and probable consequences theory presented by the prosecution rather than a lesser included offense, as Petitioner suggests. There is no federal constitutional right to a lesser included offense instruction in a noncapital case. See Hopkins, 524 U.S. at 96-98. Granting habeas relief premised on finding such a right would violate Teague. See Turner, 63 F.3d at 819. Additionally, the trial court did, in fact, instruct the jury on what constitutes simple assault, see 2 CT 212-13, and liability for coconspirators' acts, see 2 CT 214-15. Moreover, as the Superior Court noted in rejecting this claim, it was not reasonably probable that Petitioner would have been convicted of conspiracy to commit simple assault as a lesser included offense to murder. See LD 5 at 7. Ample evidence supported his conviction for voluntary manslaughter such that any error in failing to do so was harmless. As such, both claims for habeas relief fail.

### 5. Causation Instruction

Petitioner contends in Ground Eight that the trial court violated his rights to due process and a fair trial when it failed to instruct the jury with CALCRIM No. 620 on causation. <u>See</u> FAP at 8, Petition at 66-68.

At trial, several witnesses testified that the shooting occurred in the late afternoon. <u>See, e.g.</u>, 3 RT 1280, 1292-93, 4 RT 2198-99. Several other witnesses testified that the shooting occurred in the evening. <u>See, e.g.</u>, 5 RT 2772-74, 10 RT 4241. There was no consensus regarding the exact time of the shooting, but the 911 call occurred around 8:10 p.m. RT 4810. Olivares was taken to the hospital, and died six months after the shooting. <u>See</u> 7 RT 3439. Medical examiner Dr. Kevin Young testified that he performed the autopsy on Olivares and had determined that the cause of death was "sequelae" of multiple gunshot wounds—meaning "any events or complications that have happened after the initial injury." 7 RT 3426-27. Dr. Young testified that Olivares suffered from many injuries that would have been fatal had they not been treated when he entered the hospital. <u>See</u> 7 RT 3431-34. Moreover, during his six months in the hospital, he had at least eight major surgeries to address his gunshot wound injuries and had many infections before suffering a stroke in his right brain immediately before dying. <u>See</u> 7 RT 3427-29. Dr. Young found "no indication that there was any . . . gross negligence medically." 7 RT 3441-42. He hypothesized that a "four hour lag before receiving medical care would generally make [the clinical] situation worse." 7 RT 3443. However, a four-hour lag in medical care would not change his "analysis of what the cause of death is, namely, the shots." <u>Id.</u>

Counsel for Petitioner's co-defendant proposed two theories of an intervening cause of death—that the time between the shooting and arrival at the hospital caused the victim's death and that a separate infection caused the victim's death. <u>See</u> 10 RT 4811-12. He thus requested CALCRIM No. 620 on

23

causation of death based on the possibility of a superseding intervening cause of death. See 10 RT 4811. CALCRIM No. 620 states: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." Judicial Council of California Criminal Jury Instruction 620. Additional paragraphs address specific intervening causes: a vulnerable victim's injury accelerating death and negligence by the decedent, third party, or medical personnel. See id. Finally, it instructs, "[i]f you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty." Id.

The trial court noted that "it was uncontroverted that the cause of death is sequelae from the gunshot wounds, and [that the co-defendant's counsel] specifically asked [the coroner] if there was anything else, and [counsel] couldn't get [the coroner] to agree with [him]." 10 RT 4812-13. The trial court initially intended to allow the instruction, see 10 RT 4814, but ultimately determined that the coroner's testimony did not support a causation instruction, see 11 RT 5102-03.

On habeas review, the Superior Court rejected Petitioner's instructional error claim regarding CALCRIM No. 620, noting that "[n]othing in th[e] record establishes anything other than that Petitioner's actions were substantial factors in causing the Victim's death," and that "[n]othing establishes that negligence of the Victim, a third party, medical personnel, or any individual vulnerability of the Victim caused his demise." LD 5 at 7.

The Superior Court reasonably found that the trial court did not err in failing to instruct on causation. There was no substantial evidence supporting any other factors or causes of Olivares's death. The time between when Olivares was shot at when he arrived at the hospital may have worsened his symptoms. However, this is not considered an intervening cause. Nor is it

24

considered a substantial factor in his death. Sequelae from Petitioner's gunshot wounds alone caused his death. Petitioner failed to present any evidence, let alone substantial evidence, suggesting that anyone's negligence or anything specifically vulnerable about Olivares contributed to his death. Thus, instructing the jury with CALCRIM No. 620 would have been irrelevant and inappropriate. As such, the trial court did not err in failing to give the instruction, nor did the Los Angeles Superior Court err in reaching the same conclusion. As with the other instructional error claims, this claim is meritless.

**B.** **Amending Petitioner's Criminal Information**

In Grounds Three and Four, Petitioner claims that the trial court violated his constitutional rights when it allowed the prosecution to amend its information after the jury reached its verdict. See FAP at 6, Petition at 43-52.

**1.** **Relevant Facts**

The original amended information charged Petitioner with one count of murder in violation of Penal Code § 187(a) and further alleged that Petitioner had a prior conviction under Penal Code § 246 under Penal Code §§ 1170.12(a)-(d) and 667(b)-(i). See 2 CT 112-13. On January 11, 2012, the first day of Petitioner's trial, his counsel requested a bifurcated trial to adjudicate his prior conviction. See 2 RT 8 ("I would ask Your Honor to bifurcate that prior from this case."). The trial court clarified, asking "Is he going to waive jury on the strike priors and do a court trial?" Id. Petitioner's counsel confirmed, and the trial court proceeded to advise Petitioner of his right to have a jury determine whether the prior conviction alleged in the information was true. See 2 RT 9-10.[5] Petitioner then waived his right to a jury trial and his

---

[5] As explained by the California Court of Appeal, the trial court misspoke and stated that Petitioner's prior conviction was a violation of Penal Code § 245, but later clarified that the prior conviction was actually for violating § 246. See LD 1 at 17 n.9.

25

counsel joined. <u>See</u> 2 RT 10. The jury then reached its verdict, finding Petitioner guilty of voluntary manslaughter and finding true the allegation that a principal had a firearm. <u>See</u> 2 RT 245.

After the jury reached its verdict, the parties appeared at a status conference about two weeks later to discuss a schedule for a sentencing hearing. <u>See</u> 12 RT 6301. During this hearing, the prosecutor stated that he was moving to amend the information by interlineation to add "the 667(a)(1) five year prior as to the strike offense." 12 RT 6303. The trial court reacted negatively, stating that Petitioner was "entitled to a jury trial on that allegation." <u>Id.</u> The prosecutor reminded the trial court that Petitioner had waived jury as to the "same prior" and that there had been no court trial yet on the prior. <u>See</u> <u>id.</u> The trial court then relented, stating that "since he hasn't had the trial, the People are entitled to amend." 12 RT 6304. The prosecutor stated a second time that "it's the very same prior already alleged as to the strike." <u>Id.</u> Petitioner's counsel asked for "some time to research that issue," and the trial court told Petitioner's counsel that he could file something before the next hearing in approximately three weeks. <u>See</u> <u>id.</u> No objection was filed, and the information was thereafter amended by interlineation to allege that "the above offense also is a 5 year prior per PC 667(a)(1)." 2 CT 113.

Petitioner admitted the prior conviction at sentencing. <u>See</u> 12 RT 7202. Petitioner was advised of his right to a court trial on his prior conviction and chose to waive his rights to a court trial and its associated rights. <u>See</u> 12 RT 7202-07. Finding Petitioner's admission knowing and voluntary, the trial court accepted Petitioner's admission of the prior allegation to be true. <u>See</u> 12 RT 7206.

The California Court of Appeal concluded on direct appeal that the trial court did not deprive Petitioner of his right to have the same jury decide whether his prior conviction satisfied § 667(a) when it allowed the prosecution

to amend Petitioner's information. See LD 1 at 18-19. On habeas review, the Superior Court held that Petitioner's argument that the amendment "violated his Boykin-Tahl rights and his right to a jury trial" was not supported by any facts or explanation and did not warrant relief. See LD 5 at 4.

### 2. Analysis

Petitioner alleges that the trial court violated his constitutional rights because (1) he was not made aware of the amended allegation against him before waiving his right to a jury trial on his prior conviction; (2) he was not made aware of the consequences of a Cal. Penal Code § 667(a)(1) allegation before waiving his right to a jury trial on his prior conviction; and (3) his jury trial waiver was not binding after the information was amended because it increased his potential punishment by 5 years. See Petition at 51.

Whether the trial court violated state law when allowing the amended information is an issue over which the "[f]ederal habeas courts lack jurisdiction." Poland v. Stewart, 759 F.3d 573, 584 (9th Cir. 1999). Petitioner "may not transform a state-law issue into a federal one merely by asserting a violation of due process." Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997); see also King v. Giurbino, 538 F. Supp. 2d 1269, 1278-79 (C.D. Cal. 2008) (denying habeas petition where trial court allowed prosecution to file amended information to charge petitioner with prior strike offenses).

The Supreme Court has held that the constitutional right to a jury trial does not extend to a determination of whether a defendant has suffered a prior conviction. See Cunningham v. California, 549 U.S. 270, 274-75 (2007) ("[T]he Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant."); Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty

27

for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Petitioner has therefore failed to establish that his jury trial rights were violated by the trial court's imposition of the § 667(a) enhancement. <u>See</u> <u>Pruitt v. Busby</u>, No. 11-7756, 2013 WL 5651441, at *16 (C.D. Cal. Oct. 16, 2013) (rejecting similar claim).

Nor may Petitioner contend that he was deprived of his due process right to be informed of the nature and cause of the charges against him so as to permit adequate preparation of a defense. An information sufficient to give fair notice need not cite the specific statute at issue but must "in some appreciable way" state the "elements of an offense charged with sufficient clarify to apprise a defendant of what he must be prepared to defend against." <u>Gautt v. Lewis</u>, 489 F.3d 993, 1003 (9th Cir. 2007). Here, the original information alleged that Petitioner had a prior conviction, that it was a "serious or violent felony," and that he was subject to the provisions of Penal Code §§ 1170.12 (a) through (d) and 667 (b) through (i). 2 CT 113. Petitioner thus knew that his prior conviction was at issue and could subject him to an enhanced sentence. He waived his state-law right to a jury trial as to that prior conviction. The amended information merely added an additional sentencing enhancement triggered by the same prior offense. The state courts' denial of this claim was thus not contrary to, or an unreasonable interpretation of, clearly established federal law.

## C. <u>Sufficiency of Evidence</u>

Petitioner argues in Ground Six that insufficient evidence supported his conviction for conspiracy to commit simple assault, the natural and probable consequence of which was voluntary manslaughter. <u>See</u> FAP at 8, Petition at 56-63.

### 1. Relevant Law

The Due Process Clause of the Fourteenth Amendment protects a

criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of Jackson. Juan H., 408 F.3d at 1275 n.13.

Habeas claims based on allegedly insufficient evidence therefore "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam). As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

Id. (citations omitted).

The Jackson standard "must be applied with explicit reference to the

substantive elements of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n.16. In performing a <u>Jackson</u> analysis, a jury's credibility determinations are "entitled to near-total deference." <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004). When the factual record supports conflicting inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of the prosecution, and it must defer to that resolution. <u>See</u> <u>Jackson</u>, 443 U.S. at 326.

Under California law, each member of a conspiracy is criminally liable for the acts of coconspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even if such acts were not intended by the conspirators as a part of their common unlawful design. <u>See</u> <u>People v. Medina</u>, 46 Cal. 4th 913, 920 (2009). An unplanned crime is a natural and probable consequence of a conspiracy to commit the target crime where "judged objectively . . . 'a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'" <u>Id.</u> (citation omitted).

## 2. Analysis

The Superior Court rejected Petitioner's sufficiency claim, holding that "[i]t is not the function of the reviewing court on a habeas petition presenting an insufficiency of evidence claim to reweigh the evidence at trial." LD 5 at 6. It further held on the merits that "nothing presented in this Petition, or on this record, establish[ed] any basis to conclude that insufficient evidence supports the voluntary manslaughter verdict." <u>Id.</u> Finding that sufficient evidence supported the jury's verdict, it rejected Petitioner's claim. <u>See</u> <u>id.</u>

The Superior Court's rejection of Petitioner's sufficiency of evidence claim on the merits was neither contrary to, nor an unreasonable application of, <u>Jackson</u>. After viewing the evidence in the light most favorable to the prosecution, it is clear that a rational trier of fact could have convicted

Petitioner for voluntary manslaughter as a natural and probable consequence of conspiracy to commit simple assault. The jury heard testimony from Melara that several months before the shooting, Petitioner threatened Olivares that "I'll light you up motherfucker." 3 RT 1273-74. On the day of the shooting, Petitioner passed by Olivares's house three times. The first time, Petitioner and Jose confronted Melara, asking for Oliveras. 3 RT 1277. Canela testified that Jose warned Canela not to "to cover up for [Olivares]" or else "[Canela's] house would [ ] be burned down with whoever was in there." 3 RT 1595. When Petitioner returned with Jose and two other men to Olivares's house, two of the men fired multiple shots at Olivares as he stood on his front porch, striking him multiple times. <u>See</u> 4 RT 1823-24; 5 RT 2775-79.

A reasonable inference of the evidence presented at trial was that Petitioner intended to conspire with the other people in the car to—at a minimum—assault and shoot Olivares. As discussed in section IV.A.2.a, the evidence presented at trial substantially supported a finding of conspiracy to commit simple assault on Olivares. It also supported a finding that at least one of the coconspirators was armed. Moreover, a reasonable person should have known that a reasonable foreseeable and natural and probable consequence of assaulting and shooting Olivares several times was death. Thus, sufficient evidence supported a conviction for voluntary manslaughter. Habeas relief is accordingly not warranted on Petitioner's claim that insufficient evidence supported his conviction.

**D.  <u>Prosecutorial Error</u>**

Petitioner contends in Ground Ten that the prosecution erred when stating the law on aider and abettor liability during the closing argument. <u>See</u> FAP at 9, Petition at 70-72.

### 1.  Relevant Facts

During closing argument, the prosecution explained that while each defendant must be considered separately, "the law allows for liability to be imputed to each defendant or accomplice or co-conspirator" even if the defendant did not personally meet every element of a crime. 11 RT 5204. He then quoted the elements of CALCRIM No. 401 on aiding and abetting that the jury must find to convict Petitioner as an aider and abettor. See 11 RT 5205. The prosecutor explained that a perpetrator and aider and abettor are "both equally on the hook. An aider and abettor is equally on the hook as the perpetrator. In fact, they're both called principals. . . . So the person is equally guilty whether they committed the crime personally or aided and abetted the perpetrator committing it." 11 RT 5205-06.

The Superior Court rejected Petitioner's prosecutorial-misconduct claim. See LD 5 at 8. It held that the prosecutor's argument that an aider and abettor shares equal culpability with a perpetrator for the illegal activity "[did] not misstate the law or fall outside the range of appropriate closing argument." Id. The Superior Court explained that under California law, "the criminal liability of an aider and abettor is the same as that of a direct perpetrator," and that nothing demonstrated that the argument in question "undermine[d] the entire structure of the case upon which the prosecution was based." Id. at 8-9. The Superior Court also noted that the jury was properly instructed on aider and abettor liability and conspiracy under CALCRIM Nos. 400, 401, 416, 417, and 915, and the jury was instructed that if it believed an attorney's comments on the law conflicted with a jury instruction, it was to follow the jury instructions under CALCRIM No. 200. See id. at 9. The Superior Court explained that Petitioner was unable to overcome the presumption that the jurors followed the court's instructions. See id. It concluded that nothing in the record demonstrated that the prosecutor "employed any deceptive or reprehensible

methods to persuade the jury or that the jury erroneously applied the law in this case." Id.

## 2. Applicable Law

Prosecutorial misconduct rises to the level of a constitutional violation and thus warrants habeas relief only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986); Renderos v. Ryan, 469 F.3d 788, 799 (9th Cir. 2006) (same). Darden requires a two-step inquiry: (1) whether the prosecutor's actions were improper and (2) if so, whether they "infected" the trial and rendered it "fundamentally unfair." Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982). Relief is limited to cases in which the petitioner can establish that the misconduct resulted in actual prejudice, requiring the alleged error to have had a substantial and injurious effect or influence on the verdict. Shaw v. Terhune, 380 F.3d 473, 478 (9th Cir. 2004).

The Ninth Circuit has explained that in determining whether a prosecutor's words rendered a trial constitutionally unfair, a reviewing court may consider many factors, including whether the portion in question misstated the evidence, whether the judge admonished the jury to disregard the comments, the prominence of the comments in the context of the entire trial, and the weight of the evidence. Hein v. Sullivan, 601 F.3d 897, 912-13 (9th Cir. 2010) (citing Darden, 477 U.S. at 182). These factors may help mitigate the effects of a prosecutor's improper statement during closing argument. See Boyde v. California, 494 U.S. 370, 385 (1990) ("[T]he arguments of counsel . . . must be judged in the context in which they are made"). Additionally, a prosecutor is given considerable leeway to draw reasonable conclusions from

33

the evidence. <u>United States v. Henderson</u>, 241 F.3d 638, 652 (9th Cir. 2000) ("Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence."(citations omitted)); <u>see also</u> <u>United States v. Gorostiza</u>, 468 F.2d 915, 916 (9th Cir. 1972) ("In closing arguments . . . prosecution attorneys are allowed reasonably wide latitude.").

### 3. Analysis

On habeas review, the Superior Court reasonably found that the prosecutor's remark during closing "[did] not misstate the law or fall outside the range of appropriate closing argument" because under California law, "the criminal liability of an aider and abettor is the same as that of a direct perpetrator." LD 5 at 8; <u>see also</u> <u>People v. Samaniego</u>, 172 Cal. App. 4th 1148, 1165 ("equally guilty" language in the context of aiding and abetting under CALCRIM No. 400 is "generally correct in all but the most exceptional circumstances"). Moreover, the prosecutor's comment that a perpetrator and an aider and abettor are "equally on the hook" for committing a crime was made during an explanation that aider and abettor liability exists only if the defendant "knew that the perpetrator intended the commit the crime of murder, namely, shooting at a person, before or during commission of the crime, the defendant intended to aid and abet the perpetrator; and then, finally, the defendant's words or conduct did, in fact, aid and abet the perpetrator" in committing murder. 11 RT 5207. Having explained that the jury must find that Petitioner intended to aid and abet a killing rather than a lesser crime to be convicted of murder or manslaughter, the prosecutor correctly summarized California law. Thus, the prosecutor's comments did not render Petitioner's trial fundamentally unfair.

The evidence presented at trial could reasonably lead a juror to conclude that Petitioner played a major or equal role in the events leading up to the

shooting. Thus, even if the jury believed that Petitioner was not the shooter, it nevertheless inferred that he had the requisite mental state for murder or manslaughter. Accordingly, it was not misleading for the prosecutor to argue that, as a major participant in the events leading up to the shooting, Petitioner could be found "equally guilty" under an aiding and abetting theory of liability. See Dancy v. Asuncion, No. 15-02492, 2016 U.S. Dist. LEXIS 125954, *17-18 (C.D. Cal. July 8, 2016) (prosecutor did not err in stating during closing that aider and abettor is "equally guilty" as principal because statement was "generally a correct statement of California law" and no exceptional circumstances rendered statements misleading). Based on this evidence and the lack of exceptional circumstances, the prosecutor did not err during closing arguments when stating that a perpetrator and aider and abettor are equally guilty the crime committed.

Finally, the trial court properly instructed the jury on aider and abettor liability and conspiracy under CALCRIM Nos. 400, 401, 416, 417, and 915. See 2 CT 206-13. It also instructed the jury through CALCRIM No. 200 that "[i]f you believe the attorney's comments on the law conflict with my instructions, you must follow my instructions." 2 CT 172. Juries are presumed to follow the instructions given to them. See Weeks, 528 U.S. at 234. Even if the prosecutor improperly suggested that an aider and perpetrator are always equally guilty, the jury is presumed to have followed its instructions and ignored any such suggestion. See Boyde, 494 U.S. at 384-85 (prosecutorial misrepresentations "are not to be judged as having the same force as an instruction from the court"). Thus, the actions, even if improper, would not have rendered the trial fundamentally unfair.

Finally, even assuming that Petitioner makes a viable prosecutorial-misconduct argument, any alleged error did not have a substantial and injurious effect or influence on the verdict. As discussed in Section IV.A.2.a,

supra, ample evidence supported the jury's verdict. Because overwhelming evidence supported the jury's verdict, no actual prejudice occurred. Habeas relief is not warranted on this ground.

## E.    Ineffective Assistance of Counsel

Petitioner argues in Ground Eleven that trial counsel was ineffective for failing to object to the prosecutor's alleged misstatement of aider and abettor liability during his closing argument. See FAP at 9, Petition at 72-76. In Ground Twelve, Petitioner argues that appellate counsel were ineffective for failing to raise Grounds Four through Eleven on appeal. See FAP at 9-10, Petition at 77-78.

### 1.    Applicable Law

A petitioner claiming ineffective assistance of counsel must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). "Deficient performance" means unreasonable representation falling below professional norms prevailing at the time of trial. Id. at 688-89. To show deficient performance, the petitioner must overcome a strong presumption that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. Further, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. The initial court considering the claim must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id.

To meet his burden of showing the distinctive kind of "prejudice" required by Strickland, Petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a

probability sufficient to undermine confidence in the outcome." Id. at 694. A court deciding a claim alleging ineffective assistance of counsel need not address both components of the inquiry if the petitioner makes an insufficient showing on one. Id. at 697.

In Harrington v. Richter, the Supreme Court reiterated that AEDPA requires an additional level of deference to a state-court decision rejecting an ineffective assistance of counsel claim: "The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." 562 U.S. at 101. The Supreme Court further explained,

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. at 105 (citations omitted).

## 2. Trial Counsel

As discussed in Sections IV.A.2 and IV.D, the prosecutor argued that a perpetrator and an aider and abettor are "equally on the hook" where the aider and abettor knows the perpetrator intends to commit the crime, intends to aid the perpetrator, and takes steps to aid the perpetrator. The Los Angeles County Superior Court rejected Petitioner's assertion that trial counsel rendered

ineffective assistance by failing to object to this statement. See LD 5 at 9-10. In so holding, it found that Petitioner failed to substantiate his constitutional claims, and failed to show that there was a reasonable probability that a more favorable outcome would have resulted but for trial counsel's performance as required by Strickland. See id. at 9-10.

Petitioner's claim fails because, as addressed in Sections IV.A.2 and IV.D, the prosecutor did not err in his closing statement. Because the prosecutor gave a valid statement of aider and abettor liability during closing, trial counsel could not have been ineffective for failing to object. Petitioner cannot establish a reasonable probability that a successful objection to this argument would have changed the jury's verdict.

Moreover, the jury heard overwhelming evidence supporting Petitioner's conviction. See Section IV.A.2.a, supra. It received instructions requiring the jury to follow the jury instructions given rather than the prosecutor's statement of law if it determined that the two conflicted. See 2 CT 172. It is presumed that the jury followed all instructions. See Weeks, 528 U.S. at 234. Given the overwhelming evidence supporting Petitioner's guilt, any improper statement regarding the respective guilt of an aider and abettor and a perpetrator did not result in actual prejudice. The Los Angeles County Superior Court did not err in applying Strickland and concluding as much. Thus, habeas relief on this ground is not warranted.

### 3. Appellate Counsel

The Los Angeles County Superior Court also rejected Petitioner's assertion that appellate counsel rendered ineffective assistance of counsel by failing to raise Grounds Four through Eleven on appeal. See LD 5 at 10. The Los Angeles County Superior Court determined that "Petitioner has failed to establish that appellate counsel's exercise of professional judgment was deficient or that, but for counsel's alleged errors, the outcome of the appeal

38

would have been different." Id. It further held that "[a]ppellate counsel is not required to raise every non-frivolous issue and Petitioner asserts no more than a failure to raise issues." Id.

As explained above, Petitioner's claims lack merit. Thus, appellate counsel could not have been ineffective for failing to raise these claims on appeal. See Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000).

**F.    Cumulative Error**

Finally, Petitioner contends in Ground Thirteen that the cumulative effect of the constitutional violations listed above rendered his trial fundamentally unfair. See FAP at 10, Petition at 78-79. The Ninth Circuit has found that "even if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'" Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir. 2002) (quoting United States v. de Cruz, 82 F.3d 856, 868 (9th Cir. 1996)). However, as discussed above, there were no substantial constitutional errors at Petitioner's trial; and if there were any errors, they were harmless. Thus, the Los Angeles County Superior Court reasonably rejected Petitioner's cumulative-error claim. See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."); United States v. Pineda-Doval, 614 F.3d 1019, 1036 (9th Cir. 2010) (finding that even three errors by trial court, where all were independently harmless, resulted in "no prejudice, cumulative or otherwise"). Therefore, Petitioner is not entitled to federal habeas relief with respect to his allegation of cumulative error.

///
///
///
///

# V.

## CONCLUSION

IT IS THEREFORE ORDERED that the First Amended Petition is DENIED. Let judgment be entered dismissing this action with prejudice.

Dated:  November 5, 2018

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge